AO 91 (Rev. 11/11) Criminal Complaint  AUSA Anne L. Yonover (312) 886-2038

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

NATHANIEL LEE BUTLER-LUDWIG

CASE NUMBER: 23 CR 00537



FILED
10/11/2023
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about October 10, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, the defendant violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | The defendant did knowingly and intentionally possess with intent to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine, a Schedule I Controlled Substance |

This criminal complaint is based upon these facts:

  X   Continued on the attached sheet.

*Mario Kloc*

MARIO KLOC
Special Agent, Drug Enforcement Administration (DEA)

Pursuant to Fed. R. Crim. P. 4.1, this Complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the Complaint and Affidavit by telephone.

Date: October 11, 2023

*Judge's signature*

City and state: Chicago, Illinois

GABRIEL A. FUENTES, U.S. Magistrate Judge
*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, MARIO KLOC, being duly sworn, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and I have been employed with the DEA since approximately June 2022. My current responsibilities include the investigation of narcotics trafficking offenses.

2. This affidavit is submitted in support of a criminal complaint alleging that NATHANIEL LEE BUTLER-LUDWIG ("BUTLER-LUDWIG") has violated Title 21, United States Code, Section 841(a)(1). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging BUTLER-LUDWIG with possession with intent to distribute a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine ("MDMA"), a Schedule I Controlled Substance, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that BUTLER-LUDWIG committed the offense alleged in the complaint.

3. This affidavit is based on, among other things: (a) my personal knowledge of the facts and circumstances of the investigation described below; (b) information provided by other law enforcement officers, including written and oral reports that I have received from other law enforcement officers; (c) information obtained from witnesses, including confidential sources working for the DEA or other

law enforcement agencies; (d) consensually recorded communications; (e) the results of physical surveillance conducted by law enforcement; and (f) my training and experience and the training and experience of other law enforcement officers involved in this investigation.

I. FACTS ESTABLISHING PROBABLE CAUSE

A. **The Confidential Source and Individual A Conduct a Sample Transaction On September 26, 2023.**

4. Over the past two weeks, a confidential source[1] ("CS") informed law enforcement officers that a man that the CS referred to as Individual A was selling narcotics. The CS provided law enforcement with Individual A's phone number, (XXX) XXX-3249 (the "Individual A Phone"). Law enforcement officers ran the phone number for Individual A through a public records database, which revealed that the phone is associated with Individual A.

5. Thereafter, law enforcement issued an administrative subpoena to T-Mobile. The T-Mobile subpoena return listed Individual A as the subscriber and customer associated with phone number (XXX) XXX-3249.

---

[1] The CS has no current charges pending. In April 2023 the CS was approached by law enforcement agents in connection with an ongoing DEA investigation, in which the CS was observed delivering approximately ½ kilogram of methamphetamine. The CS admitted his/her involvement in money laundering and drug trafficking activities, and voluntarily agreed to cooperate with law enforcement. No promises have been made to the CS regarding future criminal charges related to the CS's previous money laundering and drug trafficking activities. The CS has a criminal history that includes various drug convictions and one conviction for aggravated kidnaping and aggravated battery with a weapon. The CS has been required to register on a violent offender youth registry. I deem the information provided by the CS as set forth in this affidavit to be reliable, as it is corroborated in significant respects by independent evidence, including physical surveillance, text message communications, and the October 10, 2023 seizure of MDMA from BUTLER-LUDWIG.

2

6. Law enforcement officers then sent an unmarked Illinois Secretary of State photograph of Individual A to the CS. The CS confirmed that the man in the photograph was Individual A. The CS told law enforcement officers that Individual A lived in the top apartment of 2321 N. Kostner Ave, in Chicago, Illinois (the "Individual A Residence").

7. On or about September 23, 2023, the CS informed law enforcement officers that Individual A had contacted the CS through the social media platform Instagram and the CS provided Individual A with his/her phone number through Instagram. Thereafter, Individual A contacted the CS on his/her cell phone, using the Individual A Phone. After the initial communication on Instagram, the conversations between the CS and Individual A occurred by text message and recorded phone calls, that were digitally saved.

8. Based on my review of the text messages between Individual A and the CS, on September 25, 2023, Individual A using the Individual A Phone, sent the CS the following message[2]:

---

[2] This investigation included the use of consensually recorded phone calls and text messages. The summaries of recorded conversations in this affidavit do not include reference to all the topics covered during the conversations. Further, quoted material from the recorded conversations as set out in this affidavit is taken from draft summaries, not final transcripts. The summaries do not include references to all statements made by the speakers on the topics that are described by the speakers. At various points in the Affidavit, I have indicated (sometimes in brackets) my interpretation of words and phrases used in the recorded conversations. My interpretations are based on information received from the confidential source, the contents and context of the recorded conversations, events that took place before and after the conversations, my knowledge of the investigation as a whole, my experience and training, and the experience and training of other law enforcement agents in this investigation.

a. "Yoo." The CS responded, "What up gang." Individual A then stated, "Nm chillin my ppl [people] got hella [a lot of] molly [MDMA] rn [right now] 750-800 a zip [ounce] was seein if u knew n e one who might possibly want some." Based on my training and experience, I understand this message from Individual A to mean that he knew someone who had MDMA and that he was looking to sell the MDMA for $750 to $800 an ounce.

b. The CS then responded, "I can ask bro. what color? It's clean or it has any meth to it? Some of my people been asking for that lately. The meth." Based on my training and experience, I understand the CS to have been asking Individual A whether the MDMA had any methamphetamine in it. Methamphetamine is a Schedule II Substance.

c. In response Individual A stated, "lol idk bout that all mdma has meth in it tho because that's what the ma stands for they take sass n ad meth to make it mdma but naah this is a1 quality whiteish grey." Based on my training and experience as well as my conversations with the CS, I understood Individual A to explain that the MDMA that Individual A had access to may contain methamphetamine, and he was explaining to the CS what MDMA is.

d. Individual A then sent the CS a video recording of the MDMA in his possession. Based on my review of the video, it contained what appeared to be a large, crystal rock.

e. After receiving this video, the CS asked Individual A if Individual A would provide the CS with a deal if the CS purchased a larger amount of MDMA.

4

Individual A responded, "I mean 8 is already cheap how much u thinkin I can give u a bird for 12; or a half for 7; or a 9 for 4." Based on my training and experience and conversations with the CS, I understand this to mean that Individual A was willing to sell the CS a kilogram of MDMA for $12,000 (a bird references a kilogram), or half a kilogram for $7,000, or 9 ounces for $4,000.

9. Following the conversation between the CS and Individual A on September 25, 2023, at the direction of law enforcement, the CS arranged to meet with Individual A to obtain a sample of the MDMA. Specifically, the CS arranged to meet Individual A at his house to obtain 3.5 grams of MDMA on September 26, 2023. Based on my review of the phone calls between the CS and Individual A, on September 25, 2023, at approximately 7:07 p.m., the CS placed a consensually recorded call to Individual A and stated, "I'm calling to see if maybe uh is it possible uh you can front me like a ball of that so I could show for my guy?" Based on my conversations with the CS, "a ball" means approximately 3.5 grams. Individual A responded in the affirmative and the CS later said in the conversation, "I for sure wanna come through like if I can tomorrow or Wednesday to get that ball. Does that work with you?" Individual A responded, "uhm ya uhm I gotta see how I would go about it, cause I know they got someone in town that I could . . . ."

10. On September 26, 2023, myself and, other law enforcement officers traveled to the Individual A Residence. At approximately 2:46 p.m., law enforcement officers set up surveillance on the Individual A Residence. At approximately 3:14 p.m., law enforcement officers observed the CS park his/her car behind the Individual

5

A Residence. Prior to traveling to the Individual A Residence, the CS was searched for contraband, and none was found. The CS was equipped with an audio and video recording devices. The video recording devices were not working, but the audio recording captured the transaction between the CS and Individual A.

11. After the CS had arrived at the Individual A Residence, the CS placed a consensually recorded call to Individual A and told Individual A that the CS was at the Individual A Residence. According to the CS, Individual A instructed the CS to go to the back. Shortly thereafter, law enforcement observed the CS enter the Individual A Residence. Only the audio recording device was working during the transaction. Based on my review of the audio recording device and my conversations with the CS, after the CS entered the Individual A Residence, he/she observed what appeared to be MDMA on the kitchen counter inside the Individual A Residence. While inside, the CS discussed the purchase of MDMA and inspected the MDMA on the counter. The CS asked Individual A what the price would be for half a kilogram of MDMA and for a full kilogram of MDMA. Individual A then provided the CS with approximately 3.5 grams of MDMA. After the transaction, law enforcement officers heard the CS exit the Individual A Residence, get into a car, and a law enforcement officer saw the car travel down an alley. Law enforcement maintained surveillance on the CS as he/she traveled to a predetermined location. Upon arriving at that location, the CS provided law enforcement officers with the sample the CS received from Individual A. Law enforcement officers field tested the 3.5 grams which tested positive for MDMA. According to lab results, the sample the CS received from

6

Individual A came back positive for Methylenedioxymethamphetamine. Law enforcement conducted a search of the CS and found no additional contraband.

    **B.    The Confidential Source Sets Up a Subsequent Transaction to Purchase 1 Kilogram of MDMA from Individual A.**

    12.    Based on my review of text messages and consensually recorded phone calls between the CS and Individual A, on October 2, 2023, the CS contacted Individual A at the Individual A Phone and informed him that he/she wanted to purchase a kilogram of MDMA. Individual A had previously informed the CS that he could provide kilogram quantities of MDMA.

    13.    Based on my review of the text messages and consensually recorded calls between the CS and Individual A, between the dates of October 2, 2023 and October 9, 2023, the CS and Individual A arranged for the sale of a kilogram of MDMA for $13,000. Specifically, the CS and Individual A discussed the price of the MDMA and the date for the transaction.

    14.    On October 4, 2023, the CS placed a consensually recorded call to Individual A. Based on my review of that call, Individual A stated, "Nothing much chillin still ain't got no word from dude but one of my homies had grabbed a bunch of them see if they gunna give me one. But it be 13 for sure." The CS then responded, "what's up with other buddies." Individual A stated, "they ain't told me shit yet . . . Nothing I can do. Still ain't give me his number." The CS then asked, "is that the dude up in New York?," and Individual A responded "yep." The CS then asked when the supplier in New York was supposed to come back. Individual A stated, "I don't know." Based on my training and experience as well as my conversations with the

CS, I understood this conversation between the CS and Individual A to mean that Individual A's supplier was in New York and Individual A did not know when he would be back. Additionally, during a consensually recorded call between the CS and Individual A, Individual A told the CS that his source of supply had forgotten to leave the key fob in Chicago before leaving for New York which would allow the source to access the bulk amount of MDMA that was stored in Chicago.

15. Based on my review of text messages and consensually recorded calls between the CS and Individual A, on October 7, 2023, Individual A told the CS that they would have to meet with a courier to receive the kilogram of MDMA in Chicago.

16. Based on my review of text messages and consensually recorded calls between the CS and Individual A, on October 10, 2023, Individual A told the CS that a courier, who was unknown at the time, would be delivering the kilogram of MDMA to Individual A's house. Individual A told the CS that the courier would be at his house at approximately 7:35 p.m.

17. Based on my review of text messages and consensually recorded calls between the CS and Individual A, on October 10, 2023, at approximately 7:38 p.m., Individual A sent a text message to the CS stating, "6 min." The CS responded, "Cool. I am at Taconazo." Based on my understanding of the investigation, and my conversations with the CS, I understand these messages to mean that Individual A was waiting for the courier to arrive and that the courier was 6 minutes away.

18. On October 10, 2023, at approximately 7:42 p.m., law enforcement observed Individual A on the front porch of the Individual A Residence and they

observed Individual A on his cell phone. Law enforcement officers were able to identify Individual A as the same person they had seen in the driver's license photo they obtained of Individual A.

19. While law enforcement officers observed Individual A on the front porch of the Individual A Residence, at approximately 7:43 p.m., law enforcement officers observed an unknown white male walk towards the Individual A Residence. This unknown white male was later identified as NATHANIEL LEE BUTLER-LUDWIG.[3] Law enforcement officers observed BUTLER-LUDWIG exit a suspected rideshare and approach the Individual A Residence. Law enforcement officers then observed BUTLER-LUDWIG enter the building where the Individual A Residence is located. Law enforcement officers saw BUTLER-LUDWIG wearing black pants, a black jacket, a black hat, a black backpack, and glasses.

20. Shortly after BUTLER-LUDWIG entered the building where the Individual A Residence is located, Individual A sent the CS a text message and stated, "He dn't wanna to go outside n make the move. Yall can come inside. My boy is a white boy." Individual A and BUTLER-LUDWIG refused to meet the CS in a public space, which was previously arranged.

21. After Individual A refused to meet with the CS in person, the CS told Individual A that his/her purported customer were backing out of the deal.

---

[3] As explained below, later the same evening, law enforcement arrested BUTLER-LUDWIG and recovered photographic identification from him.

22. Law enforcement officers continued to conduct surveillance on the Individual A Residence. At approximately 8:11 p.m. law enforcement officers observed Individual A exit his building empty handed and walk towards the area where he had previously agreed to meet the CS. Law enforcement did not see BUTLER-LUDWIG exit the building during this time.

23. At approximately 8:47 p.m. law enforcement officers observed BUTLER-LUDWIG exit the front of the building where the Individual A Residence is located. When BUTLER-LUDWIG exited the Individual A Residence, law enforcement officers observed him with the same black backpack that he had earlier when he arrived at the Individual A Residence. Law enforcement officers saw BUTLER-LUDWIG get into what they believed to be a rideshare vehicle and then leave the area.

24. Law enforcement officers followed the car that BUTLER-LUDWIG had gotten into to the area of Fullerton Avenue and Western Avenue in Chicago, Illinois. While the car was stopped at a red traffic light, law enforcement observed BUTLER-LUDWIG exit the car and walk towards a bus stop near Fullerton Avenue and Western Avenue in Chicago, Illinois.

25. At approximately 8:59 p.m., law enforcement officers approached BUTLER-LUDWIG at Fullerton Avenue and Western Avenue in Chicago, Illinois. The law enforcement officers were wearing fully identifiable police vests and attempted to engage in a consensual encounter with BUTLER-LUDWIG. As law enforcement officers approached BUTLER-LUDWIG, he discarded his black

10

backpack and cell phone, by removing the backpack from his back and dropping it to the ground and dropping the cell phone to the ground. BUTLER-LUDWIG then proceeded to run from the law enforcement officers. The law enforcement officers identified themselves and asked BUTLER-LUDWIG to stop. BUTLER-LUDWIG continued to run. Eventually, the law enforcement officers apprehended BUTLER-LUDWIG on the east side of Western Avenue.

### C. Law Enforcement Officers Arrested NATHANIEL LEE BUTLER-LUDWIG.

26. After law enforcement officers caught BUTLER-LUDWIG, they detained him and escorted him towards the vicinity of where he abandoned his black backpack and cell phone. BUTLER-LUDWIG informed the law enforcement officers that he did not want to talk. The law enforcement officers did not locate any identification on BUTLER-LUDWIG's person. The law enforcement officers asked BUTLER-LUDWIG if his wallet would be in the black backpack, to which BUTLER-LUDWIG indicated he did not know.

27. The law enforcement officers utilized a K9 to perform an air sniff of the area where BUTLER-LUDWIG fled from. The K9 tracked to the black backpack that BUTLER-LUDWIG dropped on the ground before he ran from the law enforcement officers and the K9 alerted to the presence of narcotics inside the bag. Based on law enforcement officers observations, they believed that BUTLER-LUDWIG traveled from the Individual A Residence with the kilogram of MDMA that he intended to deliver to Individual A in order to complete the sale to the CS. Based on the law enforcement officer's observations, and on their training and experience, they

11

believed that because the transaction with the CS did not occur, BUTLER-LUDWIG left Individual A's residence with the kilogram of MDMA.

28. Law enforcement officers searched the black backpack that BUTLER-LUDWIG had dropped on the ground before he ran from the law enforcement officers and they located approximately one kilogram of brown/gray crystal like substance that was consistent with the appearance of MDMA secured in a clear sandwich bag, which contained two clear plastic vacuum sealed bags. The vacuum sealed bags were inside a United States Postal Service Priority Mail package. The United States Postal Service package was contained within a plastic bag, which was inside of the black backpack. The substance inside the vacuum sealed bags appeared to be a brown/gray crystalized substance. Additionally, an unknown amount of U.S. Currency was found in the black backpack.

29. Following the arrest of BUTLER-LUDWIG, a further search of BUTLER-LUDWIG yielded a second cell phone on his person. Law enforcement officers also located a key fob on a key chain with other keys in BUTLER-LUDWIG's backpack. Law enforcement officers believe that the key fob and keys are related to Individual A's prior statements to the CS that referenced Individual A's source of supply coming from New York with a key fob to access the bulk amount of MDMA stored in Chicago, Illinois (see paragraph 12 above). Additionally, inside the backpack, law enforcement found a black rain jacket. Inside the front breast pocket, on the inside of the black rain jacket, was a wallet. Law enforcement officers found five cards inside the wallet, including an Illinois Identification Card with the name

NATHANIEL LEE BUTLER-LUDWIG, with a date of birth of XX/XX/1993, a Blue Cross and Blue Shield insurance card issued to NATHANIEL BUTLER-LUDWIG, a Chase debit visa card issued to NATHANIEL L. BUTLER-LUDWIG, a Chase Freedom visa card issued to NATHANIEL BUTLER LUDWIG, and a Vanilla Visa Gift Card. Law enforcement officers also recovered an undetermined amount of U.S. Currency in BUTLER-LUDWIG's backpack.

30. During a post-arrest interview, BUTLER-LUDWIG invoked his Miranda rights.

31. The brown/gray crystalized substance that was recovered from inside the backpack and which was packaged inside vacuum sealed bags was field tested by law enforcement and tested positive for MDMA.

## II. CONCLUSION

32. Based on the foregoing, I respectfully submit that there is probable cause to believe that, on or about October 11, 2023, NATHANIEL LEE BUTLER-LUDWIG possessed with intent to distribute a controlled substance, namely, a quantity of a mixture and substance containing a detectable amount of Methylenedioxymethamphetamine, a Schedule I Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

*Mario Kloc*

MARIO KLOC
Special Agent, Drug Enforcement Administration

SWORN TO AND AFFIRMED by telephone on October 11, 2023.

Honorable GABRIEL A. FUENTES
United States Magistrate Judge

14