```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3    UNITED STATES OF AMERICA        )  Case No. 23 CR 537
                                      )
 4      v.                            )
                                      )
 5    NATHANIEL LEE BUTLER-LUDWIG,    )  Chicago, Illinois
                                      )  February 10, 2025
 6             Defendant.             )  1:42 p.m.

 7           TRANSCRIPT OF PROCEEDINGS - SENTENCING HEARING
                 BEFORE THE HONORABLE JOHN F. KNESS
 8

      APPEARANCES:
 9

      For the Government:        MR. MORRIS O. PASQUAL
10                               Acting United States Attorney
                                 BY:  MS. ANNE L. YONOVER
11                               Assistant United States Attorney
                                 219 S. Dearborn Street, Suite 500
12                               Chicago, Illinois  60604

13    For the Defendant:         BREEN & PUGH
                                 BY:  MR. THOMAS M. BREEN
14                                    MR. CHRISTOPHER DALLAS
                                      MR. ROBERT W. STANLEY
15                               53 W. Jackson Boulevard, Suite 1550
                                 Chicago, Illinois  60604
16

17
      Court Reporter:           NANCY C. LABELLA, CSR, RDR, FCRR
18                              Official Court Reporter
                                219 S. Dearborn Street, Room 2128
19                              Chicago, Illinois  60604
                                (312) 435-6890
20                              Nancy_LaBella@ilnd.uscourts.gov

21

22

23             *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

24                 PROCEEDINGS REPORTED BY STENOTYPE
         TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION
25
```

1   (Proceedings heard in open court:)

2     THE CLERK:  23 CR 537, USA v. Nathaniel Lee Butler-

3 Ludwig.

4     THE COURT:  Good afternoon.

5     MS. YONOVER:  Good afternoon, your Honor.  Anne

6 Yonover on behalf of the United States.

7     MR. BREEN:  Good afternoon, your Honor.  Tom Breen,

8 Chris Dallas, and Rob Stanley on behalf of Nathaniel Butler-

9 Ludwig, who is the gentleman to my right.

10     THE COURT:  Good afternoon to all of you.

11     And we have our probation officer.

12     PROBATION OFFICER:  Good afternoon, your Honor.  Laura

13 Petroskey with United States Probation.  I'm filling in for

14 Officer Fowlie today.

15     THE COURT:  Officer Petroskey, thank you for covering.

16     And good afternoon to members of the gallery, as well

17 as our colleagues in the United States Marshals Service.

18     We are here for the sentencing hearing.  Is the

19 government ready to proceed?

20     MS. YONOVER:  Yes, your Honor.

21     THE COURT:  Defense?

22     MR. BREEN:  We are ready to proceed Judge.

23     THE COURT:  Mr. Butler-Ludwig, I'm going to explain to

24 you, first, how the process today will unfold, because I want

25 you to know where we're headed and the things that we have to

1    do before I can rightly and lawfully impose sentence on you.

2           The first thing that I will do, in conjunction with

3    counsel, is to make sure that I have all of the documents for

4    sentencing that I'm supposed to have.

5           Then we will address the presentence investigation

6    report, which I will refer to periodically as the PSR.  Do you

7    understand that?

8           THE DEFENDANT:  I do.

9           THE COURT:  And I may have some questions for the

10   lawyers about some of their arguments.  We'll finish

11   calculating the Sentencing Guidelines.  Then we will talk about

12   the proposed conditions of supervised release.  Then at that

13   point, once we have all of that buttoned down, then I will ask

14   the lawyers to present and summarize their sentencing arguments

15   to me, starting with your lawyers and then turning to the

16   government.

17          Once I've done all that, then I will give you the

18   opportunity to speak to me.  As I will explain later, that's

19   your right, your absolute right, to speak to me if you want to.

20   But you don't have to.  And if you choose not to, I won't give

21   you a worse sentence.  But we'll talk about that later.

22          Once I've heard from everyone, then I will summarize

23   my understanding of the federal law of sentencing.  Then I'll

24   talk about the specific factors of this case, and then I will

25   impose sentence.

1          That's going to take a little bit of time this

2     afternoon.  What that means is that if at any point you feel

3     you need to take a break, either for personal reasons or

4     because you need to speak with your lawyers in confidence, you

5     just need to let Mr. Breen or anyone else know, you can even

6     raise your hand, and we'll take a reasonable amount of time for

7     a break.  Do you understand all of that?

8          THE DEFENDANT:  I do.  Thank you.

9          THE COURT:  It's important -- again, as we talked

10    about at your change of plea hearing -- it's important, because

11    this is an important event, that you pay attention and stay

12    focused.  Do you feel like you're able to do that today?

13          THE DEFENDANT:  I do.

14          THE COURT:  Very well.

15          The first question I have is for you directly and that

16    is, did you receive a copy of the PSR?

17          THE DEFENDANT:  I did.

18          THE COURT:  Did you read the entire thing?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Without getting into the substance of any

21    conversation you may have had with your counsel, did you have

22    any questions that you asked about the PSR and did you get

23    those questions answered?

24          THE DEFENDANT:  I did, yes.

25          THE COURT:  Very well.  Let's talk about the materials

1    that are before me for sentencing.  I'll ask counsel to go

2    through this with me so that I make sure that I have everything

3    that I'm supposed to have.

4          I have the PSR with an attached government's version

5    at docket 54.  I have the sentencing recommendation at docket

6    55.  I have the government's sentencing memorandum at docket

7    59.  I have the defendant's sentencing memorandum, as well as

8    two attachments, at docket 60.  The attachments are, first,

9    letters submitted on Mr. Butler-Ludwig's behalf.  And I do

10   thank the individuals who submitted those letters for taking

11   the time to help me better understand who the defendant is.

12   And the second is a report from a service provider, Bridgeview

13   Clinical Services -- Records, rather.

14         And I think that's all that was in connection with

15   sentencing.  Is that right, Ms. Yonover?

16         MS. YONOVER:  Yes, your Honor.

17         THE COURT:  Mr. Breen?

18         MR. BREEN:  Yes, Judge.  We have a typo, I'd like to

19   address, in our sentencing memorandum and it's a pretty easy

20   one.  It says Oak Park.  It should have been Hyde Park.  I'm

21   sorry for that.  That is on page 3 of our sentencing

22   memorandum.

23         THE COURT:  Thank you for clarifying that.  I did see

24   the reference to Oak Park, but I did not catch that it should

25   have read Hyde Park.  I did see that, obviously, there was a

1    connection in --

2           MR. BREEN:  Right.

3           THE COURT:  -- Mr. Butler-Ludwig's life to Hyde Park.

4           MR. BREEN:  Right.  That's why it's our error, Judge.

5           THE COURT:  Thank you for that.

6           I would like to turn to the second attachment of

7    docket 60 because I'm not sure I got everything I was supposed

8    to have.  And I may be misspeaking.  I think it was docket 64.

9    I am misspeaking.

10          There was one attachment to docket 60.  The records

11   from Bridgeview Clinical Services were attached -- not

12   attached -- they were filed separately, with leave, under seal

13   at docket 64.

14          So I'm looking at docket 64 right now.  There seems to

15   be a little bit of incongruity between pages 4 and 5.  In other

16   words, at the bottom of page 4, there are some bullet points.

17   Then going over to page 5, it starts -- the text of page 5

18   starts mid-sentence.  Am I seeing the right -- am I reading

19   that accurately, Ms. Yonover?

20          MS. YONOVER:  Your Honor, that's what I have as well.

21          MR. BREEN:  Judge, regretfully that was what was sent

22   to us.

23          THE COURT:  I see.

24          MR. BREEN:  So I do think that there may be a page

25   missing from the clinic, but we've given to you and to counsel

1   everything that we have.  I think -- I don't know, Judge, if

2   there would -- if the absence of that really is relevant.

3            THE COURT:  That was my next question to you, which

4   is, I don't know that it would have any kind of material

5   difference for this sentencing in terms of what kind of

6   sentence I'm going to give the defendant.  But I can't make

7   that judgment.  So what I will offer to the defendant is if you

8   believe that this hearing should be continued because you want

9   to supplement the record to include that page, I will do that

10  without any cost to the defendant.

11           MR. BREEN:  And I appreciate that, your Honor.  I

12  favor bullet points myself in my life.  And I think the bullet

13  points do cover everything that could possibly have been in a

14  narrative.

15           THE COURT:  Understood.  So you're not asking me to

16  continue --

17           MR. BREEN:  No, Judge.

18           THE COURT:  Very well.

19           Ms. Yonover, I note that the defendant filed -- or

20  made pretty comprehensive argument in docket 60 concerning the

21  drug conversion ratio for MDMA, commonly known as Ecstasy, to

22  the marijuana equivalent.  You did not file a response to that,

23  which is fine.  Did you want to file a response to that?

24           MS. YONOVER:  No, your Honor.  I'm prepared to proceed

25  today and make argument on that topic.

1      THE COURT:  Very well.

2          So, again, those are the documents that appear to me

3  to be relevant for sentencing.  I have reviewed everything

4  that's been provided to me.  I thank the parties, first, for

5  their submissions, characteristically well-presented by both

6  sides, as well as I thank the probation officer for the

7  thorough and helpful report.  Officer Petroskey, if you could

8  pass that along, I would be grateful.

9          Does the government have any corrections to the PSR?

10         MS. YONOVER:  No, your Honor.

11         THE COURT:  How about the defense?

12         MR. DALLAS:  No, your Honor.

13         THE COURT:  Is the government making the third point

14 motion that's referred to in the presentence investigation

15 report at docket -- I'm sorry -- paragraph 21?  Are you making

16 that motion?

17         MS. YONOVER:  Yes, your Honor, the government does

18 move under -- for that additional point reduction.

19         THE COURT:  Very well.  Given that there are no

20 disputes over the Guidelines range -- I understood, Mr.

21 Breen -- or maybe, Mr. Dallas, you're jumping in here for --

22         MR. BREEN:  He's going to address this issue, Judge.

23         THE COURT:  Very well.  I understood the argument

24 about the conversion ratio to be brought under Section 3553,

25 not seeking a necessarily formally applicable lower Guidelines

1    range.  Is that accurate?

2        MR. DALLAS:  Judge, we're making that argument on both

3    grounds.  So we are making it under 3553.  We are making the

4    argument that sentencing Mr. Butler-Ludwig under the 1-to-500

5    MDMA-to-cannabis ratio would result in an unwarranted

6    sentencing disparity under 3553(a).

7        We are also making the argument that we're urging the

8    Court to find a policy disagreement with the ratio, based on

9    how the Sentencing Commission made that determination and came

10   to that conclusion and the evidence that they relied on at the

11   time, we're asking that the Court abandon it, similar as you

12   saw in our sentencing memorandum, sentencing courts have done

13   with crack cocaine to powder cocaine.

14       THE COURT:  Thank you.  I understand that.  My

15   question is a little bit more technical.  In other words, we

16   could go a couple of different ways here.  We could find that

17   the Guidelines range properly calculated is what is set forth

18   in the PSR, namely 37 to 46 months.  And then I could be free,

19   under all of the applicable Supreme Court and Seventh Circuit

20   case law, to disagree on policy grounds with that range,

21   specifically the conversion ratio.  But that would really be a

22   3553 argument, I believe.  Or I would make some sort of formal

23   finding of a departure, which I'm, frankly, less likely to do.

24   But why don't you tell me what your argument is.

25       MR. DALLAS:  No, that's absolutely fine, your Honor.

1    If you want to address it under 3553(a), that's perfectly fine.

2         THE COURT:  Well, I'm asking what your position is.

3    I'll make a ruling on it.  I want to know what your concrete

4    position is, and then I'll make a ruling.

5         MR. DALLAS:  Judge, I was just told that, technically,

6    we're asking for a variance.  So we're saying, yes, the

7    Guidelines are corrected -- or determined correctly, and we

8    will make our arguments in the form of a variance.

9         THE COURT:  Understood.  Thank you.  We'll get to that

10   in a minute, "that" being the question of whether I'm going to

11   vary, in the legal argument you've made, Mr. Dallas, about the

12   ratio.

13        MR. DALLAS:  Very good, your Honor.  And you're

14   prepared for arguments now?  I might have misheard you.

15        THE COURT:  Let's talk first about the proposed

16   conditions of supervised release, which are set forth starting

17   at page 20 of the PSR and they run all the way over to page 26.

18   What I'd like to know is whether I may refer to the language of

19   the proposed conditions in summary, with the understanding

20   that, subject to any discussion of specific provisions, I would

21   be adopting the language that's contained in the PSR.  The

22   alternative is that I can read all of the provisions out loud,

23   which I would be perfectly happy to do.

24        MR. DALLAS:  No objection, your Honor.

25        THE COURT:  In other words, will you waive a verbatim

1    reading on behalf of the defendant?

2           MR. DALLAS:  That's fine with us, your Honor.

3           THE COURT:  In addition, with respect to the issue of

4    the reasons for imposing supervised release in the first place,

5    as well as the length of time and the conditions, my

6    expectation is that most of my reasoning, such as it may be,

7    for the steps I take will be wrapped up in the 3553 commentary.

8    Will you also waive a separate explanation of the reasons for

9    imposing supervised release and the term and conditions?

10          MR. DALLAS:  Yes, Judge, that's fine with us.

11          THE COURT:  Mr. Butler-Ludwig, your lawyer says that I

12   don't have to read the proposed conditions of supervised

13   release out loud to you and that I do not have to give a

14   separate explanation of the reasons for imposing supervised

15   release, the term, and the conditions.  Do you agree with that

16   approach?

17          THE DEFENDANT:  I do, your Honor.

18          THE COURT:  Very well.

19          Mr. Dallas, are there any objections to the proposed

20   conditions of supervised release?

21          MR. DALLAS:  No, your Honor.

22          THE COURT:  Very well.  Subject to the comments that

23   I'll make toward the end of the sentencing hearing, my

24   expectation is that I will impose a three-year term of

25   supervised release, imposing the conditions that the probation

1  officer has recommended.  I think, in short, that length of

2  time will be necessary for the Probation Office and the Court

3  to ensure, Mr. Butler-Ludwig, that you are engaging in lawful

4  behavior.  So that's the reason for imposing supervised

5  release.

6          As far as the term, I think that amount of time is

7  what will be necessary.  And the conditions are all geared

8  toward and appropriate to the goal of ensuring that you're

9  engaging in lawful behavior and that you're getting the help

10  that you need; that you have the guideposts and the guardrails

11  that will be beneficial to you and necessary to ensuring that

12  you make the transition from custody back into normal life as

13  smoothly and effectively as possible.  But, again, we will talk

14  about that further.

15          Is there any issue with restitution?  I believe not,

16  but I wanted to just make sure.

17          MS. YONOVER:  No, your Honor.

18          THE COURT:  And forfeiture is not an issue as well,

19  correct?

20          MS. YONOVER:  That's correct, it is not an issue.

21          THE COURT:  All right, let's talk then about the issue

22  of -- before we talk about the general 3553 factors, let's talk

23  about the issue of this conversion ratio.  So you can summarize

24  your argument, Mr. Dallas, and then I will hear from the

25  government.

1          MR. DALLAS:  Yes, Judge.  What we're asking the Court

2     to do is to abandon the 1-to-500 MDMA-to-cannabis ratio and

3     apply a lower ratio or give that consideration when imposing

4     sentence.

5          The science that the Commission relied upon in the

6     year 2000 regarding the dangers of MDMA, that science is -- was

7     seriously flawed.  It's been retracted in many instances and

8     it's been discredited.

9          The Commission was concerned about three main factors

10    when assessing the final ratio -- or determining the final

11    ratio with Ecstasy; and that was the potential neurotoxicity of

12    Ecstasy.  It was that Ecstasy wasn't a hallucinogenic and that

13    Ecstasy was being marketed pretty heavily towards the youth.

14         There was also other factors that I'd like to point

15    out that the Commission kind of -- or entirely disregarded with

16    respect to Ecstasy when it was finding that making that

17    conclusion of a 1-to-500 ratio that is pretty significantly

18    different from heroin and cocaine.

19         Now, what's going to happen if we sentence Mr. Butler-

20    Ludwig under the idea that this 1-to-500 ratio is appropriate,

21    it's going to result in using a disparate drug equivalency for

22    similar narcotics, resulting in an unwarranted sentencing

23    disparity.  Basically we're saying that Mr. Butler-Ludwig's

24    conduct was more egregious or more harmful or more dangerous to

25    the community than if he did the same exact thing being found

1    with cocaine, pleading guilty to cocaine.  That would result in

2    a sentence greater than necessary.

3           Here's the problem with the science that the

4    Commission relied on: the lead scientist in those empirical

5    research studies didn't even use Ecstasy, your Honor.  He used

6    methamphetamines.

7           THE COURT:  You mean as a comparator, not personally?

8           MR. DALLAS:  Right.  Well, I don't know what he did in

9    his spare time, your Honor.

10          THE COURT:  That's a fair answer, Mr. Dallas.

11          MR. DALLAS:  Those studies were the subject of

12   being -- methamphetamines were being tested, not Ecstasy.  So

13   when you look at the Commission's authority being delegated by

14   Congress, they were supposed to enact guidelines within their

15   characteristic institutional role.

16          The two main points of their characteristic

17   institutional role was to use empirical data and to

18   acknowledge -- at least acknowledge the fact that science

19   changes, research evolves, and we learn things as we go along

20   the way.

21          I think that's really clear in this situation.  What

22   you have is studies that were relied upon that used the wrong

23   drug.  But it was also rife with methodological error.

24          There was not cross- -- they were using tests on

25   monkeys, non-human species; and they were not factoring in --

1    or using functional equivalents of the dosage or considering

2    the fact that there's differences between monkeys and humans.

3            There was also allegations that the lead scientist was

4    manipulating the data in his experiments, in his research for

5    the sake of gaining federal grant money.

6            Now, Ecstasy is not a hallucinogenic.  There have been

7    experts who testified for the defense, experts who have

8    testified for the government who have stated that Ecstasy is

9    wrongly classified as a hallucinogenic.

10           The science is unsubstantiated with respect to whether

11   Ecstasy is neurotoxic or possesses neurotoxic characteristics.

12           There's no -- one study that we cited in our

13   sentencing memorandum, that there's no statistical significance

14   from users to non-users when comparing cognitive defects.  And

15   if there was any sort of cognitive defects, they were not

16   permanent.

17           So there is -- there are studies that not only say

18   they cannot find potential neurotoxicity in Ecstasy, but if

19   there is, it's not even permanent.  And that's a big point

20   because the Commission was concerned about permanent damage for

21   Ecstasy users.

22           THE COURT:  Let me jump in with a question.  And I

23   read your argument, and it's well-presented; and you're

24   presenting the argument here today very well, Ms. Dallas.  The

25   question that came to my mind in reading all of this is that,

1   among other things, you've relied on one or more Law Review

2   articles that are set forth in your memo at docket 60.  You've

3   also relied on two Southern District of New York cases.

4           What sort of jumped out at me was that these cases

5   were well over ten years ago, right?

6           MR. DALLAS:  Yes, Judge.

7           THE COURT:  And with the exception of -- and I can

8   pull up the name of the Law Review article now, but I think

9   that Law Review article was 2018, 2019, something like that.

10          MR. DALLAS:  Right around that area.

11          THE COURT:  That's five or six years ago, and the

12  Southern District of New York cases that were heavily litigated

13  and the subject of published opinions, I believe, et cetera.

14  The Commission, admittedly, was without a quorum -- the

15  Sentencing Commission was without a quorum for a while, but

16  certainly that didn't come up until a few years ago.  I don't

17  see that the Commission has put this issue on its radar screen.

18  It certainly hasn't adjusted the conversion ratio.

19          And I'm wondering if you can illuminate that issue and

20  tell me whether you think that's just because they haven't

21  gotten to it; or have they affirmatively rejected the argument;

22  or is this something that appears to be a non-issue for the

23  Commission.  You get where I'm going with this?

24          MR. DALLAS:  I do get where you're going with this.

25  And I agree it's something that hasn't really been brought up.

1    I look back to the crack cocaine-powder cocaine ratio

2    when the Commission tried to make an amendment, and Congress

3    rejected that amendment.

4    So when I'm looking at this -- it very well could just

5    be a non-issue.  And if it is, it is what it is.  That's why I

6    think the United States Supreme Court has said judges are well

7    within their right if they find a policy disagreement with some

8    sort of -- take, for instance, the drug quantity ratio -- they

9    can abandon it and use a different one.

10    THE COURT:  Let me jump in again.  By the same token,

11    I think the Seventh Circuit has been pretty clear that

12    sentencing judges are also entitled, if they so choose, not to

13    go down a different path than the Commission went down and

14    instead to say, we're going to trust the Commission as

15    recognized penological experts and we're not going to delve

16    into -- as did Judge Kimba Wood in the Southern District of New

17    York -- we're not doing to delve into all the minutia; we're

18    entitled to say that we're going to go with what the Guidelines

19    said, at least for purposes of calculating the range.  They

20    have said that, right?  I mean, one --

21    MR. DALLAS:  Absolutely.

22    THE COURT:  -- example is --

23    MR. DALLAS:  Yes, your Honor, you're absolutely

24    correct, if you don't find a policy -- or don't disagree with

25    the policy as it is, it's within your discretion; that that is

1     what it is.  We're aware of that.

2          THE COURT:  Let me just cite a case for purposes of

3     this issue, and for example, it would be *United States v.*

4     *Martin*, 718 F.3d 684, Seventh Circuit 2013.  And in turn, the

5     Court of Appeals cited the *Aguilar-Huerta* case, 576 F.3d 365,

6     Seventh Circuit 2009, effectively arguing that a court can

7     take -- I should say *Aguilar-Huerta* said that a court can

8     accept what the Commission has done.

9          Let me be clear for the record though.  I am very

10    aware that even though a district court does not need to engage

11    in independent analysis of the empirical justifications and

12    deliberative undertakings that led to a particular guideline --

13    for that I'm citing *Aguilar* at page 368 -- that does not then

14    mean that the court can just take what the Guideline range is

15    as controlling for purposes -- or presumptively reasonable for

16    purposes of the sentencing hearings.  I'm aware of that.  But I

17    wanted to get the law right on that.

18         So I'll let you continue now.

19         MR. DALLAS:  Right.  And, no, Judge, I think you

20    summarized it correctly.  There are cases out there where

21    judges have said, I'm not going to disagree with the policy and

22    I'm not going to -- or I'm going to go along with the ratio as

23    it is, and those sentencing courts were affirmed on appeal.  So

24    it's well within your right, if you don't find any sort of

25    disagreement with the quantity ratio as it is, to go along with

1    the ratio as it is.

2           What we're urging the Court is, we want to highlight

3    for the Court that the Sentencing Commission has a role to

4    play.  They were delegated power by Congress to find the best

5    way to sentence defendants in a way that's, you know,

6    sufficient but not greater than necessary.  And we want to

7    highlight for the Court that the empirical data that the

8    Commission relied on has been discredited.  It appears that the

9    rubric that they used to make Ecstasy a lesser ratio than

10   heroin was not the rubric that they used to make Ecstasy a

11   higher ratio than cocaine.

12          And what I want to highlight for the Court is cocaine

13   trafficking, cocaine production, and cocaine use are quite more

14   dang- -- or quite -- or are more dangerous than Ecstasy

15   trafficking, production, and use.

16          Look at the negative cardiac effects that can occur to

17   habitual cocaine users; one-time cocaine users; emergency room

18   visits are higher for cocaine users.  Experts for the

19   government and defense in the past have testified that Ecstasy

20   fatalities are rare.  And so when -- and I'd like to highlight

21   the point that Ecstasy is not really an addictive narcotic,

22   where cocaine is one of the most addictive narcotics.

23          So when we're sentencing Mr. Butler-Ludwig under a

24   1-to-500 ratio and cocaine is so much more destructive than

25   Ecstasy in the community, but he's being sentenced under a drug

1  quantity ratio that's exponentially higher, it raises

2  legitimate concerns.  It raises reasonable arguments that he's

3  going to be sentenced under a guideline that's greater than

4  necessary.  And that's what we wanted to highlight for the

5  Court in our sentencing memorandum.

6          THE COURT:  I did derail a little bit both myself and

7  you on this issue though of why the Commission -- whether the

8  Commission has addressed this issue and, if not, do we know

9  why.  And I'm not sure I heard an answer from you on that.

10         MR. BREEN:  I'd like to contribute to it, Judge.

11         THE COURT:  If you could use the microphone, please.

12         MR. BREEN:  Thank you.

13         I would like to contribute to it because that was

14  exactly what we were talking about in our office getting ready

15  to make a presentation to you today.

16         They may be just letting the judicial branch do as

17  they wish under the most recent Supreme Court case, which

18  allows you to do what you wish with it.  I don't know the

19  workings of the Sentencing Commission.  You probably do.  I

20  don't.  But they may see no reason right now to address it;

21  that it's not a problem because the judicial branch will work

22  it out; they'll somehow put together a sentence that takes this

23  into consideration, which I know gets us into the 3553 area.

24         But I don't know -- I think there's -- your colleagues

25  are part of the Commission.  I don't know when they think they

1   have an important issue that they need to address and gather.

2   I don't know why they haven't done it.  It seems to me that if

3   they were to do it, an excellent argument could be made by

4   Chris Dallas as to why it should not be compared to cocaine.

5          MS. YONOVER:  Your Honor, if I may?

6          THE COURT:  Yes, one minute.  Thank you.

7          Thank you for that, Mr. Breen.

8          Mr. Dallas, anything further that you'd like to say?

9          MR. DALLAS:  No, I'll stand on that, your Honor.

10         THE COURT:  Very well.

11         Go ahead, please.

12         MS. YONOVER:  Your Honor, the Sentencing Commission in

13  August of 2016 put out a request for public comment to address

14  whether or not the MDMA equivalency should be changed.

15         That public comment specifically requested input

16  regarding whether the marijuana equivalency for MDMA as it

17  currently stands is appropriate, whether the Commission

18  established a different -- whether the Commission should

19  establish a different equivalency for MDMA and, if so, what

20  equivalency the Commission should provide.

21         My understanding, because when I received defendant's

22  sentencing memo, obviously there was concern about these

23  studies, was to immediately try to figure out what has been

24  done to address head-on these types of arguments.

25         So I contacted the Sentencing Commission.  And the

1  best that I was able to come up with to address sort of this

2  particular issue about why hasn't it changed -- there has been

3  discussion about it; the science has been determined to be

4  bad -- the answer I got was that the Sentencing Commission put

5  out this request for public comment.  They received responses

6  from the Department of Justice, from the DEA, I believe from

7  the Federal Defender's Office, and also from the Probation

8  Department.  And then nothing sort of happened after that.

9  There weren't any changes or any amendments that were made

10  following the request for public comment.

11       So I don't have a better answer for you than that,

12  other than there has been some discussion about if this should

13  change or not change, but no action has been actually taken by

14  the Sentencing Commission as far as I know.

15       I want to address your comment about, you know, the

16  Sentencing Commission being in the best position to make

17  penological decisions about Guidelines ranges, or something to

18  that effect, that you brought up.

19       There's an opinion from the Eastern District of

20  Tennessee, it's *United States v. Kamper*, 860 F.Supp.2d 596.

21       THE COURT:  And that's Kamper with a "K," right?

22       MS. YONOVER:  Correct, K-a-m-p-e-r.

23       In that opinion, which came after the *McCarthy*

24  decision, the court does a really nice job of laying out the

25  history regarding the marijuana-to-MDMA equivalency and

1  addresses *McCarthy* and the conclusion that the court made in

2  *McCarthy*.  And the court notes that while the *McCarthy* court

3  found that the bases were no longer entirely supportable for

4  purposes of the MDMA equivalency ratio, it didn't entirely

5  repudiate the conclusions the Commission drew in terms of

6  establishing the 1-to-500 marijuana-to-MDMA equivalency.

7  They noted, as defense counsel did, that there were

8  experts who testified and that opinions differed a bit on

9  whether or not MDMA is, in fact, neurotoxic.  They also found

10  that MDMA usage is marketed heavily to the youth and so that

11  was a factor that the court found persuasive.

12  But also the court concluded, in Kamper, similarly to

13  what *McCarthy* said, was that the fact that MDMA is not a

14  hallucinogen played a factor in the ultimate decision that

15  *McCarthy* came down with regarding the 1-to-200 ratio.  And also

16  some of these negative impacts that were sort of disregarded by

17  the Commission was something that *McCarthy* relied heavily on.

18  Ultimately, in Kamper, the court noted that the

19  Commission -- the Sentencing Commission was in a much better

20  position than a single judge to obtain the full scope and

21  breadth of current medical science and societal norms on

22  particular controlled substances and receive all appropriate

23  relevant information from the health, law enforcement, and

24  educational communities concerning the impact and the threat of

25  a particular drug to our families, communities, and nation.

1        I think that's -- it's the government's position that

2   that's the right approach here in terms of what the Court

3   should be doing or not doing.

4        I think whether or not the 1-to-500 ratio creates a

5   sentence that is greater than sufficient or greater than

6   necessary is a 3553(a) consideration that certainly the Court

7   can look at.  And that is what Kamper -- the court did in

8   Kamper.

9        But whether the Court should unilaterally change the

10  ratio based on bad science that has been recognized and some

11  case law, that's not the approach that the Court should take

12  for purposes of sentencing today.

13       And I do want to note that there is one Seventh

14  Circuit case that I was able to find.  It's *United States v.*

15  *Ryan Scott*.  I just had the appellate court number, which is

16  No. 10 CR 527.

17       Ultimately, the sentencing --

18       THE COURT:  Is that the appeal number or the district

19  court number?

20       MS. YONOVER:  That's -- I'm sorry, that's the district

21  court number.  Let me give you the appeal number.  It's No.

22  12-2757.

23       THE COURT:  Thank you.

24       MS. YONOVER:  And it was decided July 18th of 2013.

25  So the defendant in that case was sentenced, and one of the

1   arguments he made was regarding this 1-to-500 ratio.  And,

2   ultimately, the court didn't touch -- didn't really get to that

3   point because the defendant's criminal history was so high that

4   it wasn't going to matter what ratio was used.

5        But I want to point out that in that opinion, that

6   Seventh Circuit case, the Court noted that the defendant did

7   rely on *McCarthy*.  However, following *McCarthy* there were

8   several other district courts that had rejected *McCarthy*.  And

9   those courts included the Southern District of Illinois, *United*

10  *States v. Thompson*, it's 2012 Westlaw 1884661; *United States v.*

11  *Kamper*, which I've talked a bit about; and *United States v.*

12  *Ferguson*, 447 Fed. App'x 898, from the Tenth Circuit of 2012.

13       So, ultimately, the Commission is in the best position

14  here to make a determination about what the appropriate ratio

15  is for purposes of sentencing when MDMA is involved.

16       The Court certainly can look at what the Guidelines

17  are once it uses that ratio and then make a determination about

18  varying below the Guidelines range.  And that is really the

19  most appropriate role for the Court when it comes to looking at

20  these different ratios.

21       THE COURT:  Thank you.  Anything further?

22       MS. YONOVER:  No, your Honor, not --

23       THE COURT:  On that topic?

24       MS. YONOVER:  Yes, not on that topic.

25       THE COURT:  Turning back to you, Mr. Dallas.  First

1  off, do you have any objection to my considering the proffer

2  from the prosecutor concerning what the Commission had to

3  say -- the Commission representative had to say about receiving

4  comments in 2016 but nothing having been done about it?

5  　　　　　MR. DALLAS:  Absolutely not, your Honor.

6  　　　　　THE COURT:  Do you have any substantive response to

7  what Ms. Yonover said?

8  　　　　　MR. DALLAS:  Really briefly.

9  　　　　　THE COURT:  Take your time.

10  　　　　　MR. DALLAS:  Your Honor, I agree as a general rule

11  that the Commission is in the best position.  And I think

12  that's true on a lot of -- where they set their Guidelines at.

13  I think they made a mistake here or they -- it's not that they

14  made a mistake.  They relied on something that was represented

15  to be good science.  We have two decades to look back on it.

16  We have the luxury of hindsight that they did not have at the

17  time.  And now we can look and say a mistake was made, not

18  necessarily because of the Commission, but because of -- the

19  science they relied on has been determined to be just

20  completely discredited, using the wrong drug to analyze in the

21  first place.

22  　　　　　THE COURT:  Thank you.

23  　　　　　It's an interesting issue, and I salute the

24  defendant's team of counsel for the way it's been presented

25  here and the thorough way it's been presented.

1          I'm not going to, formally, reject the conversion

2    ratio.  And my reasons for that are pretty simple and not very

3    adventurous.

4          But I have looked at this issue.  I looked at the

5    Kamper case.  I looked at the Thompson case from the Southern

6    District of Illinois.  I looked briefly at the Ferguson

7    decision out of the Tenth Circuit.  And, in general, as a

8    general matter of sentencing temper, I think that -- I'm

9    reluctant in general to reject a guideline on the basis that

10   its empirical foundation is shaky or that subsequent

11   developments have rendered the guideline -- either the

12   guideline itself or the commentary -- questionable.

13         I took the same approach in another case involving a

14   great number of defendants in a wire fraud and identity theft

15   prosecution that's pending before me.  It's case 21 CR 277,

16   United States v. Shi, S-h-i, and many others.

17         And in that case, there were quite a number of

18   arguments from defendants that I should reject a shorthand that

19   the Commission came up with for purposes of the amount of loss

20   for any given credit card.

21         I rejected that for a lot of reasons that we don't

22   need to get into.  But part of my reasoning on that was that

23   the Commission is a body that the Seventh Circuit itself and

24   other courts have referred to as an institution filled with

25   penological experts and a lot of staff and commissioners and

1    others who take these issues very seriously.

2         And in view of the law that says that I don't have to

3    delve into the foundations of any given guideline, even though

4    I may, as a general matter, I'm reluctant to do that,

5    especially in a situation like this where this issue has been

6    perculating out there for a long time.  It suggests -- not in a

7    controlling way, of course -- but it suggests that this is

8    perhaps not -- the argument that Mr. Butler-Ludwig has raised

9    here is not necessarily controlling or without question.

10         So in this case, I'm not going to delve into the

11   underpinnings of the guideline.  I'm going to rely on the

12   guideline as a matter partly of judicial economy and partly as

13   a matter of deference to the institutional role and knowledge

14   of the Commission.

15         That said, again, I cannot, under governing law,

16   presume that the Guidelines range is reasonable.  I certainly

17   won't do that.  And I'm not bound to agree with everything that

18   the Commission says.  So I'm finding the range as it is in the

19   PSR, but I will certainly consider the arguments that you have

20   raised, Mr. Dallas, and your colleagues, on behalf of the

21   defendant, to the extent that Ecstasy is perhaps not nearly as

22   dangerous a drug as the conversion ratio suggests; that its

23   neurotoxicity is perhaps significantly lower at least than the

24   conversion ratio suggests, and maybe not evident at all; that

25   the trafficking market for Ecstasy is of a different kind and

1    scope and dangerousness than, for example, cocaine; and the

2    other arguments that you've raised along those lines.  I will

3    certainly take that into account in fashioning a sentence here.

4         That's really where I come down on this.  Is there

5    anything further, Mr. Dallas, that you'd like to say for

6    purposes of the record on this issue?

7         MR. DALLAS:  Not on this issue, your Honor.

8         THE COURT:  How about from the government?

9         MS. YONOVER:  No, your Honor.

10        THE COURT:  Very well.

11        I'll let you turn to your other arguments on behalf of

12   the defendant.

13        MR. DALLAS:  Very good, your Honor.

14        MR. BREEN:  And do -- the Guidelines have been

15   settled, correct, Judge?

16        THE COURT:  Unless you have any other Guidelines --

17        MR. BREEN:  No, your Honor, I do not.

18        THE COURT:  If you would, Mr. Breen, let me just

19   clarify for purposes of the record what we're looking at here.

20   And I'll ask Officer Petroskey to help me out with this so that

21   I get it right.

22        PROBATION OFFICER:  Sure.

23        THE COURT:  Give me one moment, please.

24      (Pause.)

25        THE COURT:  As the PSR reflects then, the custodial

1    recommendation under the Guidelines -- this is set forth at

2    paragraph 98 -- is based on a total offense level of 21, as

3    well as a Criminal History Category I, and the range is

4    37 months to 46 months.  That is, of course, advisory and

5    substantially below the maximum term of imprisonment under

6    Section 841.

7         In terms of supervised release, as we discussed

8    earlier, the Guidelines recommend a term of supervised release

9    of three years, as noted at paragraph 101 of the PSR.

10        Probation is an option here, but I'm not likely to

11   impose a term of probation, especially given that the

12   defendant's been in custody; but I don't think probation is

13   appropriate here.  In any event, the Guidelines recommend

14   against probation, paragraph 103.

15        There is a fine range, monetary fine range, for this

16   offense of $15,000 to $1 million.  That's set forth at

17   paragraph 106.  I am unlikely to impose a fine in this case for

18   reasons that I'll explain.

19        Restitution is not an issue here.

20        And then of course we have the $100 special

21   assessment.

22        Is that all accurate, Ms. Yonover?

23        MS. YONOVER:  Yes, your Honor.

24        THE COURT:  Mr. Breen?

25        MR. BREEN:  Yes, Judge.

1          THE COURT:  Officer Petroskey?

2          PROBATION OFFICER:  Yes, your Honor.

3          THE COURT:  Thank you.

4          Go ahead, Mr. Breen.  Thank you.

5          MR. BREEN:  Your Honor, delving into the 3553

6  issues -- but I think I do need to get to the PSR for just a

7  moment.

8          On page 6 of the PSR, an agent by the name of Kloc,

9  K-l-o-c, advised the probation officer as to what a co-

10 defendant had told him.  That is hearsay.  But it also, Judge,

11 is inaccurate hearsay, according to every version I've heard

12 from the best source.  And I doubt it very much if the Court

13 takes that allegation from a co-defendant, who was attempting

14 to strike a deal -- I assume the Court doesn't put much merit

15 in that statement.

16         That being the case, Judge, we look to the 3553

17 material and we look at specifically our client and we look at

18 what he is charged with.

19         I'm going to stand on everything that Mr. Dallas

20 stated about the severity of the drug involved.  But I would

21 like to talk about the individual a little bit.

22         He has a -- to me, Judge, a very interesting

23 background.  And it's pretty tough to peg him in any hole that

24 is normally available to us.

25         We know that he has never been convicted of a crime

1  before.  We know also, Judge -- through the PSR and through the

2  very insightful letters written by those who know him best, we

3  know that when employed, he is extremely hardworking and can be

4  relied on in difficult situations.

5      We know that he's introverted and we know he is

6  intelligent.  An intelligent but introverted person may not

7  necessarily cause one to mitigate.  But underlying that

8  personality are a lot of facts: his background; his family

9  situation, which regretfully the marriage, when it did not work

10  out, it did have strong effects on him personally and on his

11  behavior.

12      His schooling was interrupted.  He needed to go to a

13  public school.  And then from there, because he was absent from

14  class so often, he went to Truman -- let's see, Truman -- don't

15  help me here -- an alternative school where he received a high

16  school diploma.

17      But underlying all of that, Judge, there are

18  significant problems, mental health issues, that constantly

19  popped up in his life.

20      He never got to -- until most recently, he never got

21  to delving into what those emotional and mental issues might

22  have to do -- how they might affect his behavior.

23      So we learned from a great deal of work he did and

24  some therapists did that he is an extremely empathetic person.

25  Now, an empathetic person, Judge -- first of all, we all have

1   some empathy hopefully -- but an empathetic person is, in my

2   life, a person who is affected greatly by things that affect

3   other people.  He was empathetic towards animals.  He was

4   empathetic towards other students with problems.  And he found

5   a way to be supportive, as the letters indicate, to other

6   people's problems.

7           These are of course, Judge, lay opinions that I'm

8   giving you right now.  The mental health records have been

9   given to you.  There has been discussion in the PSR about them.

10  There's been a clinical report, at least in part, given to you.

11  There have been character letters that address his struggles.

12          Here's the problem that occurred -- and, again, an

13  introverted, empathetic, bullied kid, that is not an

14  affirmative defense to what he did.  But it is somewhat of an

15  explanation as to how he went down that road.  And the road he

16  went down was, Judge -- as a result of being bullied, as a

17  result of not wanting to go to school, as a result of not being

18  available for classwork -- he joined, you know, the other guys.

19  And from there he learned to get drugs, to do drugs, and to use

20  drugs.

21          He has been battling his self-medication program for

22  years.  And that's basically what it is.  We have someone who

23  has a personality disorder.  We have someone with grave

24  depression.  We have a very sad person.  And there's a hint in

25  the therapy notes, Judge, that he might even be on the spectrum

1   of autism.  So he is shouldering and carrying all of those

2   untreated problems.

3           He gets into this crowd, uses drugs.  There is no way

4   in heaven that this is going to end up well.  It isn't going

5   to, unless there's an awakening, unless there's a bottom,

6   unless there's "I need help; you've got to help me."

7           This event occurred several years ago.  Since that

8   time, he has learned -- I believe, and I think the reports back

9   it up -- he has learned to ask for help, which is so important.

10  He doesn't want just help.  He wants continued help.  He has

11  admitted to himself and to other people the nature of his

12  problems, and he is off to find a solution to them.

13          He's involved in therapy.  He enjoys the therapy that

14  he's been introduced to.  He wishes to help others who may be

15  suffering from the same situation with open dialogue about -- I

16  know this word is really not popular these days -- but open to

17  sharing his feelings with others, to help others overcome his

18  addictions and his bad behavior.

19          So I know, Judge, that you need to punish.  I know a

20  steel door will have to click behind him.  I understand that.

21  But I also understand that with a person like Nate who has

22  acknowledged his problems, his fears, his depression, has

23  acknowledged that he might not be just like everybody else,

24  someone who has acknowledged all of that is on a path for

25  recovery.  That's why, Judge, in the end we'll be asking for

1    the RDAP program and we'll be asking for an institution that we

2    believe can properly treat him.

3          He's not a bad guy.  That's the truth.  He's not a bad

4    guy.  He did some bad, stupid things.  I don't say and I don't

5    raise it to an affirmative defense -- and please don't mistake

6    what I'm saying as a defense -- there's a lot of other people

7    out there who have worse conditions, worse mental health

8    problems, worse family situations who are able to avoid all of

9    this.  He was not able to avoid it.

10         He has spent, your Honor, four-and-a-half months in

11   the MCC, and I know that is usually considered as time

12   considered served.  Having spent almost half a century visiting

13   the MCC, I think it should probably count for double time.  But

14   he knew full well, Judge, when he pled guilty that the Court

15   would most likely take him into custody.  He's acknowledged the

16   power of the Court and the law.  He respects the Court and the

17   law.  And he has a plan to become a better, more positive

18   person.  He has a family that has come around to support him.

19   He has a few friends to help him.  And, as I indicated, he has

20   a plan.

21         I don't think a court system or the Court will ever

22   see him again.  I certainly hope not.  It's an awakening.

23   That's what this is to a lot of people.  So he's -- I'm asking

24   for mercy.

25         The prosecutor in this case has been so professional,

1    so organized in this matter, right up to her presentation

2    regarding the Commission today.  We understand her

3    recommendation.  But we're asking, Judge, for something

4    substantially less than 37 months.

5         As an anecdote, he, as a youngster, used to spend a

6    month or two every summer in Germany where he became very, very

7    close to his grandmothers, uncles, aunts, and cousins over

8    there.

9         THE COURT:  What part of Germany?

10        MR. BREEN:  Go ahead.

11        THE DEFENDANT:  It's the very southern end of Germany.

12   It's a very small town called Meersburg.  It's right on the

13   Bodensee on the Swiss border.

14        THE COURT:  So more on the east side, southeast?

15        THE DEFENDANT:  That's correct.

16        THE COURT:  Thank you.  Go ahead.

17        MR. BREEN:  We found out, Judge -- and I can't swear

18   by this; the language is subject to interpretation -- but it

19   appears that Germany will not allow a person to visit Germany

20   if they have been prosecuted for an offense that would result

21   in possible incarceration more than 24 months.  I've never

22   heard that before.  His mom, who is here in court, has checked

23   it out.  That's her understanding.  That's our client's

24   understanding.  So I'm just throwing that number out, Judge,

25   for your consideration.

1      In any event, Judge, I'll stand on what has been

2  submitted to you.  I think the family letters really tell it

3  all.  Obviously they're biased and probably subject to self-

4  reflection.  He could be a very positive asset to the community

5  and I, Chris, and Rob would bet on it.

6      Thank you, Judge.

7      THE COURT:  Thank you, Mr. Breen.  Before I turn to

8  Ms. Yonover, I have a couple of questions for you.

9      First of all, just as a matter of understanding this

10  offense and who Mr. Butler-Ludwig is, what is the defense

11  position as to how he got involved in narcotics trafficking?

12      In other words, it seems like he could have one of at

13  least two options.  One is that he started using drugs, and as

14  part of that addiction and that behavior led to being involved

15  with individuals who could then introduce him to narcotics

16  trafficking.  Or another option is that he just decided to get

17  into trafficking in a controlled market, a black market, and

18  that that, in turn, led to the drug abuse.

19      MR. BREEN:  Let me ask him the question, Judge, and he

20  may very well want to answer it.

21     (Counsel and defendant conferring.)

22      MR. BREEN:  Judge, he wishes to answer the question.

23      THE COURT:  Thank you, Mr. Breen.

24      THE DEFENDANT:  I believe the first statement you made

25  was the most accurate.  I was doing drugs; and in order to

1   support my own drug addiction, I began selling drugs.  And in

2   the course of using narcotics, I was introduced to people who

3   were partaking in those activities; and thusly I'm sort of --

4   peer-pressured, things of that nature, and one thing led to

5   another.

6           THE COURT:  All right.  Thank you, Mr. Butler-Ludwig.

7           And then, Mr. Breen, the other thing that I sometimes

8   ask about in drug sentencings is, you know, we throw around

9   these numbers like a kilogram here or two kilograms there.  And

10  it doesn't really mean much.  And I'm going to ask this

11  question in full awareness that you'll think that I'm

12  necessarily going to find this a hugely aggravating factor.

13  It's no more aggravating in this case than any drug case

14  involving distribution quantities.  But I like to try to get an

15  idea of what we're talking about with the drug weight and the

16  number of individual doses.

17          Now, the government, in its memo at docket 59, page 7,

18  made a couple of representations about MDMA or Ecstasy being

19  consumed in a tablet form; and that a typical user quantity

20  will vary, but most tablets range from 50 to 150 milligrams;

21  and that MDMA users typically take MDMA by stacking, taking

22  three or more tablets at once, or by piggybacking.

23          So I understand from all of that that there's a little

24  bit of vagueness.  But are those representations, in the

25  defense view, more or less accurate?

1         MR. BREEN:  Judge, would you be precise in the

2  question?  I was just speaking to him as the question was

3  coming out.  I apologize.

4         THE COURT:  Sure.  The question is:  The

5  representations that I just summarized for you, representations

6  made by the government, are those generally accurate in your

7  view?

8     (Counsel and defendant conferring.)

9         THE DEFENDANT:  I'm not sure as to the dosage that's

10  standard per pill.  But I was under the impression that in the

11  sentencing guideline, when converting MDMA pills to MDMA

12  powder, the conversion was 250 milligrams per pill.

13         THE COURT:  And would a user take one pill for any

14  given dosage?

15         THE DEFENDANT:  I believe that's accurate.

16         THE COURT:  Do we have anything from Mr. Dallas?  You

17  seem to be coming forward.

18         MR. DALLAS:  Judge, real quick.  What the

19  government --

20         MR. BREEN:  He should be wearing a white lab suit,

21  Judge, for Mr. Dallas.

22         MR. DALLAS:  Judge, real quick.  What the government

23  said though, based on my research about the piggybacking, maybe

24  taking one, two, or three of the 100- or 150-milligram tablets,

25  that was my understanding when I was looking that up yesterday.

1          THE COURT:  Okay.  Give me a moment here.

2     (Pause.)

3          THE COURT:  As a very rough calculation, if we agree

4     that one kilogram equals a million milligrams, if I divide a

5     million by 250, that gives us 4,000.  So would that be -- from

6     the defense view, would it be accurate for me to think that a

7     kilogram of MDMA would roughly equate to 4,000 individual

8     dosages?

9          MR. BREEN:  That sounds right, Judge.

10          THE COURT:  How about from the government?

11          MS. YONOVER:  Your Honor, the statistics that we

12     included in our sentencing memo are from, as you saw the

13     reference to the cite, the Department of Justice's Drug

14     Enforcement Administration fact sheet.  So certainly I'm

15     relying on what I'm getting from the DEA there.

16          I think it would probably be fair to say, on the high

17     end if we use the 50 to 150 milligrams, we're looking at about

18     6,000 -- a little over 6,000 user dosages.  If we use the 250,

19     it would be on the lower end of the 4,000.  So maybe somewhere

20     between 4,000 and 6,000 individual user dosages.

21          THE COURT:  But I understood -- thank you for that.

22     But I understood your argument to be that most tablets range

23     from 50 to 150 milligrams, but users usually take, say, three

24     at a time.  So that might be considered an individual dosage,

25     right?

1      MS. YONOVER:  That's correct, your Honor.

2      THE COURT:  So that might be more like 2200, something

3  like that?

4      MS. YONOVER:  Yes, I think the math is right -- your

5  math is right.

6      THE COURT:  All right.  I'm not going to get hung up

7  on the exact number here.  But I think it's safe to say that at

8  a very conservative estimate level, probably at least 2,000

9  individual doses in a kilogram.  Is that right, Mr. Breen?

10      MR. BREEN:  Judge, I can't contradict that, and I'll

11  go with it.

12      THE COURT:  Okay, it just helps me to have a little

13  bit of perspective here.  Thank you.

14      Anything further, Mr. Breen?

15      MR. BREEN:  No, your Honor.

16      THE COURT:  I will turn back to Mr. Butler-Ludwig

17  after I hear from Ms. Yonover.

18      MS. YONOVER:  Yes, your Honor, I'm going to start with

19  the history and characteristics and then talk through some of

20  the other 3553(a) factors that support our recommendation of a

21  low-end Guidelines range of 37 months and why that is

22  sufficient but not greater than necessary here.

23      So starting with the defendant's history and

24  characteristics.  As defense counsel has pointed out, there's

25  certainly several mitigating factors here.  I think starting

1    with the criminal history, that is a mitigating factor.  The

2    defendant has no criminal history.  He has two prior arrests,

3    but they're quite old; and there was nothing about the ultimate

4    disposition of those arrests that I can glean from the PSR.

5         Additionally, as the defendant reported to Probation,

6    he did have a good childhood; however, his parents' divorce had

7    a significant impact on him.  Again, I think defense counsel,

8    the PSR do a good job of laying out what that impact was.  It

9    was very disruptive for the defendant.  He had to change

10   schools.  He ultimately started going to school somewhere new

11   where he was frequently bullied.  He describes himself as being

12   more introverted and shy, and the divorce really had an impact

13   on him.  Certainly those factors are mitigating.

14        Ultimately, we know that he turned to drugs and

15   alcohol to self-medicate.  And he struggled with substance

16   abuse and addiction for a long time.

17        That factor, to me, I think is both aggravating and

18   mitigating; mitigating in the sense that it can sort of

19   explain, as we heard today, how he got involved in the conduct

20   at issue in this case.  It seems aggravating considering the

21   fact that, in the PSR, it documents some of the physical

22   effects that defendant's drug use has had on him, including the

23   loss of his sense of smell and taste, as well as nerve damage

24   that he's experienced.  And that sort of demonstrates that the

25   defendant certainly knows the harmful effects that drugs can

1    have on an individual's body.

2         Another piece that I found to be particularly

3    interesting -- again, sort of falls into both of these

4    categories of mitigating and aggravating -- was the report on

5    the defendant's work history.

6         So in the PSR and in the letters of support, it was

7    very clear that the defendant, and as defense counsel said, you

8    know, excels and is hardworking and is reliable and can be

9    depended on.  That's a great quality and hopefully will be

10   something that the defendant can fall back on when he's

11   released on supervised release.

12        But it's aggravating in the sense that it really

13   doesn't explain why the defendant would turn to drug dealing.

14   I think we got an answer to that question to some extent; that

15   it was really to fuel his own addiction.  But if he was doing

16   well and excelling in a work environment, it really does make

17   it a little more difficult to understand why he would turn to

18   drug dealing.

19        I want to talk a little bit about the nature and

20   circumstances of the offense.  Again, I know you've reviewed

21   the sentencing memo that we submitted, so I'll try not to

22   repeat too many of the arguments in there.

23        As the Court knows, distribution of narcotics is a

24   serious offense.  The defendant here had planned to distribute

25   over a kilogram of MDMA.  As we just put into perspective, I

1  think the parties all agree, on the conservative end, that's

2  about 2,000 individual doses of MDMA out into the community.

3         He played an active role in the plan to drug-deal, as

4  he was the person who came to his co-defendant's apartment with

5  the MDMA that was for sale.  He talked to the CS, the

6  confidential source, and encouraged the CS to complete the drug

7  deal by coming into the apartment.  When the CS refused to do

8  that, the defendant called off the drug transaction and then

9  left his co-defendant's apartment.  When law enforcement

10 approached the defendant, the defendant ran, dropped his

11 backpack and phone.  And the backpack obviously was later

12 recovered and found the approximately one kilogram of MDMA in

13 the bag.

14        The memo lays out the impacts and effects of MDMA.

15 There are some more positive effects of taking MDMA; people

16 feel a sense of euphoria.  It can also, however, cause

17 confusion, anxiety, depression, paranoia, sleep problems, and

18 drug cravings.  And some studies do suggest that it has a

19 damaging effect on memory and learning capabilities.

20        The defendant's role here in the drug transaction

21 demonstrated his disregard for the law and the well-being of

22 others.  And so a low-end Guideline sentence is appropriate.

23        Turning to the seriousness of the offense and the need

24 to promote respect for the law.  Again, the defendant planned

25 to distribute almost a kilogram of MDMA into the community.  A

1    low-end Guideline sentence would not only reflect the

2    seriousness of the offense but it would also promote respect

3    for the law by sending a message that this type of conduct will

4    not be tolerated and that there are serious consequences for

5    people who plan to distribute narcotics in our communities.

6              Turning to adequate deterrence and the need to protect

7    the public from further crimes of the defendant.  As the

8    defendant argued in his sentencing memo and cited to certain

9    Commission studies, the chances of recidivism are certainly

10   lower for an individual who has no criminal history.  That

11   being said, there is still about a 30 or so percent chance of

12   recidivism.

13             A custodial sentence of 37 months would have a

14   deterrent effect on the defendant, and it should discourage him

15   from committing additional crimes in the future.  This

16   deterrent -- this sentence would also protect the public from

17   further crimes by the defendant.

18             And I just want to note something that was referenced

19   in Exhibit 2, which I know was filed under seal so I don't know

20   if we want to put the next part under seal since I'm going to

21   be referencing specifically to this exhibit.

22             THE COURT:  What's the defense preference?

23             MR. BREEN:  May I look and see what she is referring

24   to?

25             THE COURT:  Yes.

1         (Counsel conferring.)

2              MR. BREEN:  I have no problem with it, Judge.  You've

3    read it.

4              THE COURT:  All right, go ahead.  Thank you.

5              MS. YONOVER:  At Exhibit 2 on the second to last page,

6    one of the overarching themes in therapy since the defendant

7    has began included addressing a desire to commit crimes.

8              That, again, suggests to me that there is a need for

9    some specific deterrence here, given the report in that

10   exhibit.

11             THE COURT:  Where is that again?  I'm sorry.

12             MR. BREEN:  That's on that Bridgeview Clinical, Judge.

13             THE COURT:  Yes.

14             MR. BREEN:  If you go to -- hold on.

15             MS. YONOVER:  It's the second to last page of

16   Exhibit 2, and it's the second to last bullet point on the

17   bottom half of the page.

18             THE COURT:  Got it.  Thank you.

19             MS. YONOVER:  So, your Honor, given all of those --

20             THE COURT:  Let me just jump in for a second if I

21   could.

22             MR. BREEN:  I was going to respond also too, Judge.

23             THE COURT:  I understand, Ms. Yonover, why you're

24   making that argument.  But this is under the heading

25   "Overarching Themes in Therapy."  And the bullet point that

47

1   we're talking about has the title "Emotional Dysregulation."

2   That's d-y-s.  And it says, The client struggles with risky

3   behavior, thoughts, impulsivity, desires to do drugs, desires

4   to commit crime.

5           I understand your point.  I don't know that it is

6   particularly motivating for me in this sentencing because what

7   someone divulges to their therapist may be at the outer

8   boundary of their worst fears and worst impulses, and we don't

9   know what kind of crimes they're talking about.  It could range

10  from jaywalking to mass murder.  We just don't know.  So I get

11  your point, but you can move on.  Thanks.

12          MS. YONOVER:  Your Honor, I don't have anything

13  further.  Given all of those arguments, we believe that a low-

14  end Guideline sentence is sufficient but not greater than

15  necessary here.

16          THE COURT:  I have two questions for you.  The first

17  is, the defendant made an argument that I see a lot these days

18  and, that is, the argument, in a nutshell, that it is the --

19  with respect to the general, or maybe specific deterrent

20  component, perhaps both -- it is the certainty of punishment

21  not the length of punishment that is most active.  And they

22  cited a few studies that are allegedly peer reviewed.

23          Does the government have a view on that, on the

24  general proposition that it is the certainty rather than the

25  length of punishment that provides deterrence?

1      MS. YONOVER:  Your Honor, I'm aware of the studies

2  that you referenced.  Admittedly -- I think, respectfully, that

3  the length of the sentence also has a deterrent effect as well,

4  although I know that that's contrary to what the studies

5  articulate and say.

6      THE COURT:  All right.  I'll ask Mr. Breen a question

7  about that in a moment.

8      The second question is, with respect to paragraph 9 of

9  the PSR, Mr. Breen mentioned that and said that he did not

10  believe that information was reliable.

11      Is the government asking me, for purposes of this

12  sentencing, to rely on those statements in any way?

13      MS. YONOVER:  No, your Honor.

14      THE COURT:  Very well.  Thank you.

15      With respect to paragraph 9, Mr. Breen -- and, by the

16  way, thank you for your presentation, Ms. Yonover.

17      With respect to paragraph 9, Mr. Breen, does that cure

18  the issue, given that I'm not going to rely on that information

19  either --

20      MR. BREEN:  It does, your Honor.  Thank you.

21      THE COURT:  On the issue of this argument about

22  certainty versus length of punishment, I have, as I said, heard

23  that argument a lot.  I'm always a bit curious about it.  You

24  practice fairly regularly at 26th Street; is that right?

25      MR. BREEN:  Yes, Judge, I do.

1          THE COURT:  I see a lot of criminal defendants in

2     front of me who have extensive criminal histories; and much

3     more often than not, perhaps most of the time, those criminal

4     histories arise from, come out of, the state court system in

5     Cook County.  And I see a significant number of defendants who

6     have repeated convictions for very serious crimes and

7     repeatedly what might be charitably characterized as lenient

8     sentences in the state court system.

9          And those convictions seem to go over the course of

10    oftentimes multiple years, sometimes decades.  And I'm

11    wondering whether I should take any practical or anecdotal

12    message from that, as opposed to the Law Review articles that

13    talk about certainty versus length?

14         MR. BREEN:  Judge, I think this is -- I'm quite sure

15    you're doing it in your own mind right now.  That's why

16    sentencing is an -- it's to the individual.  In other words, a

17    sentence of six years in Stateville might have no effect

18    whatsoever on a certain defendant.  But that same sentence

19    would be -- change his life forever.  A much less sentence, the

20    one that we're talking about here, is a deterrence to him

21    individually.  Whether it's a deterrence to other people who

22    are selling drugs, I don't know.  Quite frankly, Judge, I don't

23    believe in that deterrence of the general public, for obvious

24    reasons and I -- you might even agree with me on that.

25         We're talking about an individual here.  And 3553

1   talks about an individual.  I think he's paid a price already.

2   I anticipate him having to pay some additional price to his bad

3   conduct.

4        But then I see in 3553 that one of the purposes of

5   sentencing is to provide the defendant with needed educational

6   or vocational training, medical care, or other correctional

7   treatment in the most effective manner possible.  So him being

8   incarcerated and going through a treatment program, with him as

9   an individual, I believe will strongly suggest he will not

10  recidivate.

11       Now, another person who may be in the lockup, it might

12  have no effect on him whatsoever.  But that's why we

13  specifically train our ideas towards an individual.  General

14  deterrence, we can debate about that.  But deterrence on him

15  individually, this event in his life, has caused him to want to

16  be a different person.  So any sentence the Court imposes, even

17  if it were time considered served, is going to have a deterrent

18  effect on this gentleman.

19       But for him to be stable, he needs the treatment.  And

20  right now the Bureau of Prisons has a very good program for

21  treatment.  And I think a longer sentence would serve no

22  purpose whatsoever.  Thank you.

23       THE COURT:  Thank you, Mr. Breen.  Is there anything

24  further you'd like to say before I turn to Mr. Butler-Ludwig?

25       MR. BREEN:  No, your Honor.  I appreciate the time

1   you've given us.

2         THE COURT:  Of course.

3         Mr. Butler-Ludwig, it is now your opportunity to speak

4   to me if you so choose.  As I said before but will reiterate

5   now, you have the absolute right to speak to me before I decide

6   on and impose your sentence.  But if you decide to remain mute,

7   not to say anything, I will not give you a worse sentence

8   because you chose not to speak to me.  Do you understand that?

9         THE DEFENDANT:  I do.  Thank you.

10        THE COURT:  What is your choice?

11        THE DEFENDANT:  I'd like to make a statement.

12        THE COURT:  Go ahead.  If you could turn the

13  microphone up a little bit, please.

14        Thank you, Mr. Breen.

15        THE DEFENDANT:  Thank you, your Honor.

16        Over the past year, I was out on bond and more recent

17  months at the MCC.  I've done much reflecting on my actions and

18  how they've gotten me to where I am today.  I know I have

19  problems, some self-inflicted, some maybe not.  I want to do

20  better.  I think I can do better.

21        Before I was taken into custody, I was working through

22  therapy.  It was very intense.  I learned a lot about myself

23  and the mistakes that I've made in my life, especially I should

24  have asked for help a long time ago, however I was --

25        THE COURT:  If you could slow down just -- just slow

1  down a little bit.  I want to make sure --

2            THE DEFENDANT:  I apologize.

3            THE COURT:  I want to make sure I hear what you're

4  saying.  Go ahead.

5            THE DEFENDANT:  I apologize.  I'm a little nervous.

6            THE COURT:  I understand.  I get it.  And I heard what

7  you said so far, just go a little slower.  Thank you.

8            THE DEFENDANT:  Since being in custody, I think it all

9  came crashing down on me.  I have been a mess, to say the

10 least.  But I see a second chance at life if I start doing

11 things right.

12           With the second chance at life, I plan to use it to

13 its fullest potential.  While I plan on participating in an

14 intensive residential drug and alcohol program to continue both

15 my sobriety and mental health treatment, I also hope to help

16 other addicts overcome their struggles.

17           My goal is to also be a positive change by tutoring

18 other inmates for their GED course, as well as teaching a class

19 on DBT therapy, something which has greatly helped me in my

20 mental health journey and I believe will do the same for others

21 that need therapy themselves.

22           After I'm released, I plan to further my education by

23 earning a bachelor's degree in finance from Northeastern

24 Illinois University, something I regret not accomplishing years

25 ago.

1          My long-term goal, also plan to receive a real estate

2     license and be financially stable for when the time comes to

3     start a family and raise children of my own.

4          I know you hear things like this all the time.  I know

5     these are just plans, but I hope that it will -- I will have

6     the strength to fulfill them now that I'm willing to ask for

7     help from others.  I think I have a good chance of turning my

8     life around, and I'm willing to work hard to do so.

9          Thank you, your Honor.

10         THE COURT:  Thank you, Mr. Butler-Ludwig.  Have you

11    said everything that you wanted to say?

12         THE DEFENDANT:  I have.  Thank you.

13         THE COURT:  Very well.

14         Let's talk about what the law of sentencing is, and

15    then we'll talk about this case.

16         In general, as we've talked about before and you've

17    learned through the course of this case and as you may have

18    learned from your own reading, but there are a couple of things

19    that sentencing judges have to do.  The first we've done

20    already, which is to calculate the Guidelines range.  I believe

21    it's been calculated accurately; but, in any event, somebody

22    has to make a decision on that, and with the input from both

23    sides and then from our probation officer, I've figured out

24    what the advisory Guidelines range is.

25         And then what I need to do is take that range into

54

1    account, into serious account, and then look at the factors

2    under Section 3553(a), which are binding, and determine from

3    those what sentence will be sufficient but not greater than

4    necessary to meet the purposes of sentencing that are set forth

5    in that statute that I just mentioned.

6         And the purposes of sentencing are many.  I won't

7    recite every one of them.  Suffice to say, I do -- I am

8    familiar with what they are.  I will touch on some of them just

9    so that the record is clear.  But the sentence must account for

10   the nature and circumstances of the offense.  It must reflect

11   the seriousness of the offense; promote respect for the law;

12   provide just punishment.  Deterrence is a factor, both

13   general -- that is to say deterring other individuals who might

14   be contemplating similar criminal acts -- as well as specific,

15   and that is specific to the individual.  The sentence imposed

16   must protect the public from further crimes by the defendant.

17        I must also bear in mind your history and

18   characteristics.  And as with every human being who touches on

19   the criminal justice system, you have positive factors and

20   negative factors.  The most negative factor here is what you've

21   done.  But you don't have a criminal history that accounts for

22   any points.  In fact, your previous involvement with the law

23   was a long time ago and has not been substantiated anyway.  So

24   for practical purposes, it doesn't weigh on me.

25        You have mitigating factors as well.  I'll touch on

1   those.  But the point being that you have -- like every human

2   being, you have positive attributions and you have less

3   positive attributions.

4          I must also, as Mr. Breen mentioned, make sure that

5   the sentence I impose provides the kind of needed treatment

6   that you get.  I just want to make a point on that, which is

7   that I cannot give you prison time or give you a longer prison

8   sentence because I think it would be good for you.  The law is

9   pretty clear on that.  As I understand that portion of Section

10  3553, what I believe it commands a judge to do is bear in mind

11  that a defendant may need rehabilitation, may need training and

12  things like that.  And to the extent that a long prison term

13  would interfere with that, that is a consideration.  While you

14  are in prison though, you should be receiving whatever things

15  are available to you.  That's what I understand.

16         Finally -- and, again, this is not an exhaustive

17  list -- I need to make sure that the sentence I impose avoids

18  unwarranted disparities between you and similarly situated

19  individuals.  By that we mean individuals who committed roughly

20  similar crimes and who have roughly similar characteristics:

21  age, criminal history, upbringing, all that kind of stuff.

22         All of those factors need to be considered.  And you

23  can tell, I'm sure, you're a smart guy, that these factors

24  sometimes tug against one another.

25         So in looking at it, basically they boil down to four

1  considerations: punishment, incapacitation -- punishment, by

2  the way, is sometimes referred to as retribution --

3  incapacitation; that's the idea that if someone who has

4  committed a crime is put in prison, it will be harder for them

5  to commit further crimes while they're in custody.  We need to

6  consider, as well, the need for deterrence; and that is the

7  idea, as I spoke of earlier, deterring others and you from

8  doing future crimes.  And then, finally, rehabilitation.

9        When I look at this case, there are a number of

10  factors that pull both ways.  The case has been very well-

11  presented by both sides.  You have an excellent team of

12  lawyers.  And they have brought to my attention, as well as

13  anyone could, the factors that pull in your favor and pull

14  against a longer term of imprisonment.  And I think that those

15  factors are strong here.  But there are factors that pull the

16  other way as well.

17        And when I look at this case, I think about -- in

18  terms of what you did and the need for the sentence to reflect

19  that, it was a significant amount of drugs that you possessed.

20  And I will just say that in listening to the arguments here

21  today and having presided over this case for a while and read

22  the facts, even though I'm not considering what's in

23  paragraph 9 of the PSR, I think I can draw a fairly non-novel

24  or controversial conclusion that this probably wasn't your

25  first rodeo.  And let me tell you why.

1          Individuals are not entrusted with distribution

2   quantities of drugs without being trusted.  Or, put it this

3   way, individuals can't get their hands on distribution levels

4   of drugs unless they've been around for a while.  Nobody walks

5   into a relationship with an upstream supplier or into a

6   neighborhood where drugs are being sold or an area and buys

7   distribution quantities of drugs without being a known

8   quantity.

9          So I think the inference that I draw from that, based

10  on the quantity, as well as your awareness and sophistication,

11  as detailed in the factual basis of your plea -- and I'll

12  detour here and say a little bit; that you obviously were

13  uncomfortable going into the apartment where Mr. Robinson was

14  talking about having you meet the confidential source.  That

15  suggests to me that you were aware of what this business is and

16  you knew about it.  In other words, you weren't a babe in the

17  woods.

18          So when I look at the quantity and your behavior --

19  talking about, at a minimum, 2,000 individual doses of a

20  dangerous controlled substance being put out on the street --

21  that is aggravating.  And it calls for, in my view primarily, a

22  sentence of punishment, a sentence that you need to pay -- that

23  will reflect your need to pay for what you did.  So when I look

24  at 3553, primarily I'm driven in aggravation by the need to

25  provide just punishment, reflect the seriousness of what you

1     did, and promote respect for the law.

2           In terms of the question of deterrence, we talked a

3     little bit about that today.  That matters to me as well.  But

4     I agree with Mr. Breen, I don't think that the deterrent need

5     to you is particularly high.  I think that you appear to me to

6     be someone who understands what it is that you did, who wants

7     desperately to avoid getting involved in the criminal justice

8     system in the future.  You have family support.  I think that

9     helps as well.  You have expressed a motivation to improve your

10     education, to improve your standing in life, and to get out of

11     this case and move on with your life.  And I think you're being

12     sincere about that.  So, to me, that weighs against the need

13     for specific deterrence.

14           General deterrence for me is always a consideration, I

15     think a legitimate consideration.  I share Mr. Breen's

16     practical, real-world view that it may be -- deterrent effect

17     in a general sense may be a chimera.  But it's still something

18     that matters.  And I think, broadly speaking, if every

19     sentencing judge throws up his or her hands and says, well, it

20     doesn't matter because nobody is being deterred, it may not --

21     doing longer sentences may not have a noticeable effect

22     immediately, but doing nothing, I think, would have the

23     contrary effect.

24           And as support for that point, I think generally I can

25     look at what has happened as various sentencing systems have

1  gone progressively lenient in their punishment of crime.  And I

2  think it's not necessarily a wrong inference to draw that that

3  has contributed to the apparent rise in crime over the last few

4  years.  But just so we're clear, that's a minor point in my

5  mind.

6          In terms of avoiding unwarranted sentencing

7  disparities, we'll talk about the Guidelines for a minute.

8  It's an issue that I'm very keen on.  I'm aware of the

9  provenance of the sentencing Guidelines, what they came out of.

10 Judge Frankel, Marvin Frankel, of the Eastern District of New

11 York was one of the intellectual forebearers of the determinant

12 Guideline-based sentencing system because, as he said,

13 sentencing without some guideposts -- I'm paraphrasing here --

14 is an invitation to chaos and lack of logic and order.

15         The Guidelines to me, as the courts of review have

16 noted, remain an invaluable tool to try to smooth out those

17 disparities.  They are based on real-world data.  They're based

18 on sentencing patterns nationwide.  And they help provide a

19 guidepost for an exercise that is hugely consequential for

20 everyone who is sentenced.  If we don't have something at least

21 along those lines, we might as well put a dartboard in every

22 courtroom and have the judge throw a dart at the wall and see

23 what the number is.  We have to have some logic and reason;

24 and, to me, the Guidelines help provide that.

25         That said, I'm also mindful, very mindful, of my

1    discretion and that I can vary from the Guidelines, provided

2    that my reasons are sound and fully explained.

3           And in this case, I do think a variance below the

4    Guidelines range is warranted.  Ms. Yonover has made a strong

5    argument that a Guidelines sentence is necessary.  And I'm not

6    saying it wouldn't be reasonable at all.  But I think a

7    sentence moderately below the Guidelines is more in line of

8    what's required here, and that's because of the factors in

9    mitigation that we've talked about.

10          I do think -- having just talked about the importance

11   of the Guidelines, I have felt for some time that, on average,

12   drug guidelines tend to be a little bit heavy, especially when

13   you're dealing with larger quantities of drugs.  So I am

14   frequently amenable to an argument to go somewhere outside of

15   the Guidelines range.  Not always, certainly.  But I do think

16   if presented with compelling circumstances, I believe that I

17   can look at a Guidelines range and say it's a little bit too

18   much for a given case.  And this is one of them.

19          I believe that your personal circumstances growing up

20   are mitigating.  I do see mitigating circumstances like this

21   with a lot of defendants.  I do.  A lot of defendants have

22   family issues growing up.  A lot of defendants are beaten

23   mercilessly by their parents or they grow up in high-crime,

24   high-drug trafficking neighborhoods.  They grow up without one

25   or more parents.  They grow up without adequate nutrition,

1  shelter, education.  And so as depressingly heartbreaking as

2  that is and as difficult as your circumstances were given your

3  parents' divorce and your challenges at school, they are

4  mitigating but not to the extent that I think you have argued

5  for.

6       In terms of your mental health conditions, those are

7  mitigating as well.  They are a little bit counterbalanced

8  though by the need for the sentence I impose to protect the

9  public.  So, as does every sentencing judge, I have to balance

10  those considerations and I have to look into the future and

11  predict what you're going to be like.  And I oftentimes -- and

12  your case is no difference -- hedge a little bit.  I can

13  believe everything you've told me and everything your lawyers

14  have told me and everything that's set forth in the PSR and

15  still have the feeling, as I do here, that there's a little bit

16  of concern that you might fall back into that lifestyle.  So to

17  hedge against that and protect the public for as long as

18  reasonably might be necessary, that pulls in the other

19  direction.

20       But I want to be clear that it is mitigating as well,

21  including your agoraphobia, as well as your possibility of

22  being on the autism spectrum, and the damage that was done to

23  you through the ill behavior of your classmates, which we've

24  all witnessed at various times and it doesn't make it any

25  better and it is certainly harmful.  We wish people didn't act

1    that way, but the book Lord of the Flies was written for a

2    reason.  Kids can be very cruel, and I understand that.

3            As far as your involvement in this offense and whether

4    it's aggravating or mitigating, I think I will credit your

5    having told me that you got involved in this as a consequence

6    of your drug use.  It's not an excuse, but it puts you in a

7    better light than had you just made the cold and calculating

8    decision to engage in trafficking in a controlled substance

9    purely for profit.

10           Those are generally my thoughts on what the main

11   factors are in this sentencing.  And before I impose sentence,

12   I do want to ask Mr. Breen first whether I -- recognizing I've

13   disagreed with some of your points, but do you feel that I've

14   at least addressed Mr. Butler-Ludwig's principal arguments in

15   mitigation?

16           MR. BREEN:  Your Honor, you've been patient.

17   You're -- while I'll, you know -- why we take a position on the

18   record regarding other issues, we appreciate the time.  And

19   it's pretty obvious you've read everything and listened to us.

20   And we couldn't ask for more from you.  And we couldn't have

21   asked more from the prosecutor.  Thank you.

22           THE COURT:  Thank you, Mr. Breen.  If there are any

23   procedural irregularities or errors I've committed, please tell

24   me about them now.  I obviously haven't talked about appellate

25   rights.  But if there's anything I can fix now, please let me

1    know.

2              MR. BREEN:  Very good.  I know of none, Judge.

3              THE COURT:  Thank you.

4              Same questions for you, Ms. Yonover.

5              MS. YONOVER:  None that I'm aware of, your Honor.

6              THE COURT:  Very well.

7              And I will note that the sentence I'm about to

8    impose -- and I'll put a big flashing light here; this is an

9    attempt at an inoculating statement on appeal.  As the Seventh

10   Circuit has called it in cases like *United States v. Asbury*, 27

11   F.4th 576, and others, an inoculating statement must be both

12   detailed and explain the parallel result.  I'll get to that in

13   a minute.  But the fact is that if I'm wrong on the Guidelines

14   issue that we discussed and the Guidelines range is what the

15   defendant argued it could be -- which was I think 8 to 16 or

16   something like that -- I think that would be significantly

17   below what is necessary, to the extent that it would -- the

18   Guidelines range would be 30 to 37, based on a 1-to-200

19   conversion ratio as noted in the two Southern District of New

20   York cases talked about -- I think that range would be more

21   reasonable, but I wouldn't give a similar variance because I

22   think that range would be about right.  So that's how I see the

23   issue of the Guidelines.

24             But, be that as it may -- give me one moment, please.

25        (Pause.)

1   THE COURT:  Therefore, Mr. Butler-Ludwig, under the

2   Sentencing Reform Act of 1984, it is the judgment of the Court

3   that the defendant, Nathaniel Lee Butler-Ludwig, be committed

4   to the custody of the Bureau of Prisons to be imprisoned for a

5   total term of 31 months on Count Two of the indictment.

6   You must pay a special assessment to the United States

7   of $100.  I am not imposing a fine, given the interests that

8   you have, as well as your financial condition.  I'm not going

9   to impose costs of supervision or costs of incarceration.

10   As discussed earlier and for the reasons I've talked

11   about here, I find that a three-year term of supervised release

12   is warranted.  Upon your release from imprisonment, you must be

13   placed on a term of -- will be placed on a term of supervised

14   release of three years, as noted.  Within 72 hours of your

15   release from the Bureau of Prisons, you must report in person

16   to the Probation office in the district to which you are

17   released.  While you are on supervision, you must comply with

18   the mandatory, discretionary, and special conditions that were

19   delineated in Part D of the presentence investigation report

20   and discussed here on the record in summary.

21   Officer Petroskey, are there any other aspects of the

22   sentence that I haven't addressed?

23   PROBATION OFFICER:  No, your Honor.

24   THE COURT:  Thank you.

25   Ms. Yonover?

1          MS. YONOVER:  No, your Honor.

2          THE COURT:  And Mr. Breen?

3          MR. BREEN:  No, your Honor.

4          THE COURT:  Let me say a further word about the

5    sentence, Mr. Butler-Ludwig.  I know it's not as low as you

6    wanted it to be.  I recognize that.  But it's as low as I think

7    I reasonably could go.  It is six months below the bottom end

8    of the Guidelines range.  I am, as I said, a judge who takes

9    the Guidelines range very seriously.  So this sentence is a

10   reflection of what I see in total in this case, and I think

11   it's what's appropriate.

12         That said, you're free to disagree with what I've

13   done, and you're free to disagree with it both subjectively and

14   legally.  If you wish to appeal this judgment, any notice of

15   appeal must be filed within 14 days of the entry of judgment or

16   within 14 days of the filing of a notice of appeal by the

17   United States.

18         If you so request, the clerk will prepare and file a

19   notice of appeal on your behalf.  If you cannot afford to pay

20   the cost of an appeal or for appellate counsel, you may apply

21   to have the Court waive the costs and appoint you a lawyer.

22         Do you understand your appellate rights?

23         THE DEFENDANT:  I do.

24         THE COURT:  And let me ask your defense counsel, is

25   there anything further that you would like me to address --

1    other than the RDAP recommendation, which I will certainly

2    include in the judgment and commitment order, any other

3    recommendations?

4          MR. DALLAS:  Your Honor, aside from that, no.  We

5    would just make a recommendation to Terre Haute's RDAP program.

6          THE COURT:  You would like me to recommend Terra Haute

7    and the RDAP program?

8          MR. DALLAS:  Yes, please.

9          THE COURT:  Very well, I will make that

10    recommendation.  Mr. Butler-Ludwig, the Bureau of Prisons is

11    free to reject the recommendation.  I know that they do try to

12    heed it whenever possible, but they have their own subjective

13    interests that they're entitled to consult.

14          Anything further, Mr. Dallas?

15          MR. DALLAS:  Nothing further from the defense, your

16    Honor.

17          THE COURT:  Again, do you feel that there are any

18    arguments or objections that I failed to address adequately?

19          MR. DALLAS:  No, your Honor.  I stand on Mr. Breen's

20    comments.

21          THE COURT:  Very well.  Thank you, Mr. Dallas.

22          Ms. Yonover, anything further?

23          MS. YONOVER:  No, your Honor.

24          THE COURT:  Mr. Butler-Ludwig, I will leave you with

25    what I have hinted at and said in this case, both at your

1    change of plea hearing and now, and earlier today, I continue

2    to believe and hope that this was an aberration in your life.

3    I sincerely hope that you lean on your family.  I sincerely

4    hope that your family provides you support in a continuing way

5    and in an even increasing way as you go through this time in

6    prison and as you get out and lead your life.  I know prison is

7    not fun.  I can't say I've ever served a term, but I know from

8    my experience that it is a terrible thing.  I recognize that.

9    But you will get through it.  You will get out of prison.  You

10   will lead your life.  And I sincerely hope that you don't ever

11   do anything to wind up back in a situation like this again.

12          With that, the hearing is concluded.

13       (Concluded at 3:26 p.m.)

14                    *    *    *    *    *

15   I certify that the foregoing is a correct transcript of the

16   record of proceedings in the above-entitled matter.

17

18   */s/ Nancy C. LaBella*                    *March 6, 2025*
     Nancy C. LaBella, CSR, RDR, CRR
19   Official Court Reporter

20

21

22

23

24

25